```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION
```

James Iding,                    :

      Plaintiff,             :

  v.                            :     Case No. 2:10-cv-387

Commissioner of Social          :     JUDGE GREGORY L. FROST
Security,                             Magistrate Judge Kemp

      Defendant.             :

<u>REPORT AND RECOMMENDATION</u>

### I. <u>Introduction</u>

Plaintiff, James Iding, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for a period of disability and social security disability benefits and for supplemental security income. Those applications were filed on May 28, 2004, and alleged that plaintiff became disabled on January 31, 2002 as a result of hepatitis C and Barrett's syndrome.

After initial administrative denials of his claim, plaintiff was given a hearing before an Administrative Law Judge on October 9, 2007. In a decision dated November 9, 2007, the ALJ denied benefits. That became the Commissioner's final decision on March 12, 2010, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on June 29, 2010. Plaintiff filed his statement of specific errors on September 17, 2010. The Commissioner filed a response on December 15, 2010, and plaintiff did not file a reply brief. The case is now ready to decide.

### II. <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff's testimony at the administrative hearing is found at pages 538 through 563 of the record. The following is a

summary of the facts to which plaintiff (who was 47 years old at the time of the hearing and has a GED) testified.

Plaintiff had not worked since January 31, 2002. Prior to that, he was a house painter and an applier of coating systems. He stopped working after becoming ill and being diagnosed with hepatitis C. He underwent eight months of treatment for that disease but discontinued treatment because he became suicidal. He continues to experience fatigue due to low oxygen levels in his blood. His other limiting condition is ankle pain stemming from a broken ankle.

Plaintiff testified that he can lift forty or fifty pounds. He thought he could lift twenty pounds on a regular basis. He can walk a block or two before becoming fatigued. If he were to rest half an hour, he could walk that far again. He becomes tired even from sitting.

Plaintiff admitted to past marijuana use. He had been drug-free for about a year prior to the hearing, and was involved in some counseling for that problem. He had also stopped drinking alcohol, having been told that he might die from it, and discontinued his cocaine use as well.

Plaintiff stated that he was able to relate well to others and that he is not bothered by crowds. He was able to go grocery shopping with his girlfriend. However, he experienced mood swings and was depressed at the time of the hearing. He also reported obsessive-compulsive tendencies and attention deficits.

On a typical day, plaintiff watches television, talks on the telephone to relatives, walks, and naps. He is able to do some light housecleaning and grocery shopping. His mental status has improved in the past year since he started medications. He did not believe he could work due to weakness and fatigue. He has occasional crying spells as well.

### III.  The Medical Records

The medical records in this case are found beginning on page 111 of the administrative record. The Court will summarize only the records that relate directly to plaintiff's statement of errors, which, as more fully described in Section VII below, deal primarily with records from Drs. Flanagan and Tilley. Other records will be summarized to the extent that they provide necessary background for his claims.

As plaintiff testified, he has been diagnosed with hepatitis C. He was treated by Dr. Ionna, who prescribed Rebetron therapy. It was discontinued in September, 2002, due to severe depression. As of February, 2003, Dr. Ionna reported that plaintiff was not drinking. (Tr. 120).

A hospital note dated June 27, 2005, made by Dr. Antonchak. indicated that plaintiff was reporting treatment for depression, but Dr. Antonchak thought it more likely that he had a generalized anxiety disorder. He changed plaintiff's medications on that date. (Tr. 260-61). That note was part of a series of records documenting treatment for recurrent pneumonia in the 2004-05 time frame.

The record also contains a number of progress notes from counseling sessions at the North Community Counseling Centers. They show that he exhibited varying degrees of depression but they also show use of alcohol and cocaine. He was prescribed various medications including Lexapro, Haldol, and Klonopin. On May 22, 2006, the treating source, Dr. Flanagan, reported that plaintiff was "being treated for a serious, chronic psychiatric condition requiring medication management and behavioral health counseling. This condition prevents the client from obtaining or maintaining meaningful employment, and compromises several other areas of his daily functioning." His prognosis was characterized as "indeterminable." (Tr. 416). At his intake interview two months before, he admitted to substance abuse but stated it

mostly consisted of abuse of Xanax.  (Tr. 439-40)

Plaintiff was evaluated by Dr. Tilley, a psychologist, for purposes of both his social security claim and for the Ohio Department of Job and Family Services.  Dr. Tilley reported on June 5, 2006, that plaintiff had been in counseling for just a short time and was taking Lexapro, Klonopin, Haldol, and Cogentin for manic depressive disorder and obsessive compulsive disorder. He reported a remote history of alcohol abuse and a more recent history of marijuana abuse.  His affect was appropriate and he did not appear either depressed or irritable.  He was able to read at a fourth to fifth grade level.  He scored very low on the WAIS, achieving a full-scale IQ score of 65.  Dr. Tilley diagnosed OCD along with a rule-out diagnosis for bipolar disorder as well as borderline intellectual functioning.  He rated plaintiff's current GAF at 50, and explained that he did not diagnose mild mental retardation because of the scores plaintiff achieved on tests of his adaptive functioning.  He rated the severity of plaintiff's impairments in specific areas on a form, indicating a number of moderate impairments, but stated in the narrative portion of his report that plaintiff was unemployable from a purely psychological standpoint, and that this condition was expected to last for nine to eleven months. (Tr. 455-65).

Just a few weeks later, Dr. Flanagan completed a form showing that plaintiff had marked impairments in at least two crucial areas, maintaining attention and concentration and completing a workday or work week without undue interruption from psychological symptoms.  (Tr. 472-74).  Other than some additional counseling notes, there are no other significant records relating to plaintiff's psychological impairments.

####    IV.  The Medical Expert's Testimony

A medical expert, Dr. Snider, also testified at the

administrative hearing.  His testimony begins at page 563 of the record.  In his opinion, plaintiff was suffering from hepatitis C with some evidence of Barrett's disease, chronic esophagitis secondary to gastroesophageal reflux disease, a history of polysubstance abuse, and recurrent hypersensitivity pneumonia.  He also suffered from OCD, anxiety, depression, an open reduction of his ankle, and pulmonary disease.  From plaintiff's onset date forward, Dr. Snider believed he could lift twenty pounds, stand or walk for one hour at a time and up to four hours in a workday, sit for unlimited periods of time, and operate foot controls.  He should avoid climbing or working around heights or extremes of temperature as well as moving machinery.  He could bend and crouch occasionally but could not crawl or drive.  Also, he should not work around solvents or increased smoke or fumes.  Dr. Snider saw no objective basis for plaintiff's having to nap on a daily basis, but he did think his fatigue was real.  He did not address any limitations arising from the psychological impairments documented in the record.

V.  <u>The Vocational Expert's Testimony</u>

A vocational expert, Mr. Brown, also provided testimony during the administrative proceedings (Tr. 569-583).  He described plaintiff's past work as a painter as medium and skilled.  If plaintiff had the limitations described by Dr. Snider, he could not do that job, nor would he have any job skills that would transfer to other jobs.  However, he could do approximately 12,000 light jobs in the central Ohio area, including assembler, machine operator, and hand packer.  If he had additional limitations consisting of a work environment without significant changes, no significant interaction with the general public, only occasional interaction with supervisors and co-workers, and jobs involving only simple instructions, the number of positions he could hold would be cut by 50%, but the

types of jobs he could do would remain the same.

## VI. The Administrative Law Judge's Decision

The administrative decision appears at pages 12 through 22 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured status requirements of the Social Security Act up to December, 2007. The ALJ next found that plaintiff had not engaged in substantial gainful activity from his alleged onset date forward.

As far as his impairments are concerned, the ALJ found that plaintiff did have severe impairments including Barrett's esophagus/gastroesophageal reflux disease, hepatitis C, remote history of recurrent pneumonia, history of fractured left ankle, depression, obsessive compulsive disorder, borderline intellectual functioning, and history of drug and alcohol abuse. None of these impairments, however, were severe enough automatically to qualify plaintiff for benefits under the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

As far as plaintiff's limitations were concerned, the ALJ found that plaintiff had the residual functional capacity to perform work at the light exertional level, subject to the physical limitations which were, more or less, those described by Dr. Snider, the main difference being that the ALJ found plaintiff's ability to stand and walk was half of what Dr. Snider testified to, that he could lift twenty pounds occasionally but only five pounds frequently, and that plaintiff could climb stairs with handrails. The ALJ did not make a specific finding that plaintiff had any psychological limitations.

In determining whether plaintiff could perform substantial gainful activity, the ALJ specifically used the Medical-Vocational Guidelines as a framework for the decision, noting

that it would direct a finding of "not disabled" were plaintiff able to perform a full range of light work. He did not make a specific finding about what jobs, or how many of them, plaintiff could perform, but in the narrative portion of his decision, the ALJ stated that he accepted Mr. Brown's testimony on that subject. As a result, he concluded that plaintiff had not demonstrated an entitlement to disability benefits.

VII. Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises two issues. First, he contends that the Commissioner erred in not affording due weight to the opinion of his treating physician, Dr. Flanagan (and also to the psychological evaluator, Dr. Tilley), both of whom believed plaintiff to be disabled. Second, he argues that he should have been found to satisfy the requirements for disability found in Section 12.05(c) of the Listing of Impairments. The Court reviews the administrative decision under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into

account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

The Court will deal with the second claim of error first. In order for a claimant to qualify for disability under Section 12.05(C) of the Listing of Impairments, the claimant must meet both the criteria for mental retardation and have another impairment which significantly limits his or her ability to perform work-related functions. The Listing sets forth certain qualifying scores on IQ tests which must be achieved in order to demonstrate mental retardation, but such a score is not sufficient to prove the existence of mental retardation. According to the preamble to the Listing, the claimant must also demonstrate deficits in adaptive functioning which manifested themselves prior to age 22. If that evidence is absent, the Listing has not been satisfied. See Brown v. Secretary of H.H.S., 948 F.2d 268 (6th Cir. 1991).

Here, it is true that plaintiff scored within the required range (60 to 69) on the IQ test administered by Dr. Tilley. However, Dr. Tilley did not diagnose mental retardation, but rather borderline intellectual functioning. His interview notes did not mention any deficits in adaptive functioning prior to age 22. At the hearing, plaintiff testified that he was in regular classes in school through the twelfth grade, that he never failed a course, and that he obtained his GED. Given this record, the ALJ did not err in finding that plaintiff did not satisfy the

-8-

requirements of this section of the Listing.

The other issue raises questions about the way in which the ALJ dealt with the evidence about plaintiff's psychological impairments. Plaintiff's main contention is that the opinions of both Dr. Flanagan, his treating source, and Dr. Tilley, who did an evaluation, were not given much, if any, weight in the ALJ's determination of his residual functional capacity.

There are some internal inconsistencies in the administrative decision about plaintiff's psychological impairments. The ALJ characterized plaintiff's depression, obsessive-compulsive disorder, and borderline intellectual functioning as "severe" impairments and, in Finding 3, Tr. 20, listed them as such. By definition, such a finding means that each one of these three impairments is one which significantly limited plaintiff's mental ability to perform basic work activities. See 20 C.F.R. §404.1520(c) ("If you do not have any impairment ... which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment ..."). However, in the "findings" portion of the administrative decision, the ALJ did not list any limitations arising out of those disorders. See Finding 6, Tr. 21. That finding is also inconsistent with the narrative portion of the administrative decision, which states that "[f]rom a mental standpoint, the claimant is able to perform simple tasks with simple instructions in a stable work environment with no interactions with the general public, more than occasional interactions with supervisors, more than rare interactions with coworkers, or significant changes in daily routine." (Tr. 18). These issues are further compounded by the ALJ's failure specifically to find that the only jobs which plaintiff could perform were those identified by the vocational expert in response to a question which incorporated psychological

limitations.  See Findings 11 and 12, Tr. 21, which refer only to the Medical-Vocational Guidelines and not to the testimony of the vocational expert, and which do not identify which jobs plaintiff can still perform.

Here, however, the parties do not appear overly concerned about these inconsistencies.  Rather, they both argue the case based on the premise that the ALJ, as the narrative portion of the administrative decision recites, found that plaintiff had certain psychological limitations from his impairments and that the vocational expert's testimony about whether someone with these limitations, and plaintiff's other limitations, could perform a substantial numbers of jobs.  Consequently, the Court will also assume that the basis of the ALJ's decision is to be derived from the narrative report rather than from the specific numbered findings which appear at Tr. 20-21, and will discuss plaintiff's first assigned error in that context.

Certainly, a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983).  Further, if there is no contradictory evidence, a treating physician's statement of disabling limitations is entitled to controlling weight unless there are good reasons for discounting that opinion either in whole or in part.  20 C.F.R. §404.1527(d). If the ALJ does discount such an opinion, the administrative decision must articulate a valid rationale which is sufficient to allow both the claimant and the reviewing court to understand the basis for the ALJ's decision and to determine whether it comports with the "substantial evidence" standard and the applicable regulations.  See Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the only two mental health sources whose opinions appear in the record both concluded that plaintiff is disabled from a mental health standpoint. Dr. Tilley's opinion was accompanied by specific findings of mental limitations which are not necessarily inconsistent with the ability to do some limited range of work-related functions, and he also suggested that plaintiff's disability might not last the required twelve months, but Dr. Flanagan, the treating psychiatrist, clearly imposed enough marked restrictions on plaintiff's ability to work so that, if his opinion were credited, plaintiff would have to be found to be disabled. Thus, the question is why the ALJ did not accept that opinion, and whether the reasons given were both substantively valid and sufficiently well-articulated to withstand review.

In discussing whether any of plaintiff's psychological impairments satisfied any portion of the Listing of Impairments, the ALJ first rejected Dr. Tilley's conclusion about plaintiff's employability because his report did not support the presence of any marked limitations of function and because marked limitations were inconsistent with plaintiff's activities of daily living. He also noted that the impact of plaintiff's substance abuse was not mentioned by either examiner. Later in the administrative decision, in discussing plaintiff's residual functional capacity, the ALJ added that Dr. Tilley and Dr. Flanagan both relied on plaintiff's subjective report of symptoms and that the ALJ did not find him fully credible.

In defending the ALJ's decision, the memorandum in opposition notes, among other things, that Dr. Flanagan had been treating plaintiff for only two months before he made his evaluation, and that the GAF score which was assigned as part of the initial evaluation (70) is inconsistent with severe psychological symptoms. These observations, along with many

other things which might appear in the record of Dr. Flanagan's treatment notes and treatment history, cannot be found in the administrative decision, and, as a result, the Court cannot sustain the ALJ's decision on the basis of such *post hoc* rationalizations. See, e.g., Bushor v. Comm'r of Social Security, 2010 WL 2262337, *8 (S.D. Ohio April 15, 2010), citing Wilson, supra. Consequently, the Court must focus on what the ALJ actually said his reasons consisted of, rather than what other evidence he could have cited in support of his decision.

    Dr. Tilley concluded that plaintiff had no marked limitations of function, and only moderate limitations in the areas of dealing with detailed instructions, being around others, maintaining concentration and attention for extended periods, keeping a regular schedule, and completing a normal work day or week without interruption from psychologically-based symptoms. (Tr. 465). One reason the ALJ gave for "rejecting" this opinion (Tr. 16) - that it is not consistent with plaintiff's reported daily activities - seems questionable, given that plaintiff's daily activities since 2002 did not include working. To the extent that plaintiff continued to socialize and interact well with the public, the ALJ could have discounted the restriction on being around others, but the remainder of these restrictions are not incompatible with the daily life plaintiff described, which consists mostly of staying at home napping or watching television. However, even if this particular rationale provides little in the way of support for "rejecting" Dr. Tilley's conclusions, it appears that the ALJ actually accepted the conclusions set forth by Dr. Tilley at Tr. 465, because he found that "the above evidence supports a finding of no greater than 'moderate' limitations in the functional domains of activities of living, social functioning, and concentration/persistence/pace," Tr. 16, which is exactly what Dr. Tilley also concluded. Thus,

it seems the ALJ rejected only Dr. Tilley's ultimate conclusion concerning employability, which he was entitled to do, since that is not a judgment to be made by a consultative psychological examiner.

The reasons given for rejecting Dr. Flanagan's report (which does contain limitations incompatible with work) included the fact that they were based largely on plaintiff's self-report of symptoms and that they did not reflect his substance abuse. While there are various mentions in the record that plaintiff abused alcohol, cocaine, Xanax, or marijuana from time to time, a reasonable person could not translate these fairly isolated references into a finding that plaintiff's reported psychological symptoms were due in large, or even small, part to some type of chronic or persistent substance abuse, especially given his lengthy history of depression and other psychological conditions such as OCD, which is not intuitively a symptom of substance abuse (and nothing in this record suggests that it is).  The failure of either Dr. Flanagan or Dr. Tilley to mention substance abuse as a contributing factor to plaintiff's psychological condition more logically supports the conclusion that they did not think it significant, rather than that they were misled into diagnosing psychological impairments which were actually being caused by substance abuse.  Further, if substance abuse were an issue, the ALJ should have determined plaintiff's residual mental functional capacity taking that problem into account, and then determined plaintiff's functional capacity without reference to substance abuse, which he did not do.  See, e.g., Brueggemann v. Barnhart, 348 F.3d 689 (8th Cir. 2003).  Consequently, this factor cited by the ALJ deserves little weight.

The only other reason given for discounting Dr. Flanagan's opinion is that it was based on plaintiff's self-reported symptoms and that plaintiff was not fully credible.  That

rationale can, in some cases, be enough to permit discounting a treating source's opinion. See, e.g., Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). Here, however, the ALJ's discussion of the credibility issue as it relates to Dr. Flanagan's report is so perfunctory that the Court cannot tell which symptoms the ALJ believed to have been reported incorrectly, or even which reported symptoms Dr. Flanagan was supposed to have taken into account in imposing marked restrictions on some of plaintiff's work-related activities. This type of generalized dismissal of a treating psychiatrist's opinion - especially when many mental health opinions are necessarily based to some extent on what the patient tells the doctor - is too conclusory to satisfy the Wilson standard. Again, although the record may well contain other facts which might justify crediting Dr. Tilley's opinions over those of Dr. Flanagan, the ALJ's decision does not rely on them, nor does it discuss in any details the notes of mental health treatment which post-date both Dr. Flanagan's initial report and Dr. Tilley's assessment, even though plaintiff continued to be insured for disability purposes well after those reports were made.

### VIII. Recommended Decision

In this case, the Court concludes that the rationale given for the Commissioner's overall treatment of the mental health evidence is insufficient. This includes the failure to provide an adequate rationale for rejecting the opinion of the treating source, ambiguity in the rejection or adoption of the opinion of the evaluating source, uncertainty about which mental limitations were actually incorporated into the residual mental functional capacity finding, and, if those limitations came from one of the two opinions of record (and there are only two), how they relate to the limitations imposed by those sources. Therefore, it is recommended that the plaintiff's statement of specific errors

(Doc. #16) be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four. On remand, the ALJ should also make specific findings of fact which address the complete residual functional capacity of the plaintiff and the extent to which a finding that he can perform substantial gainful activity (should such a finding be made) is based on the vocational evidence of record rather than simply the Medical-Vocational Guidelines.

## IX.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge